# CHARLESTON.

Oscar V. Ewing v. Coal & Coke Railway Company.

Submitted April 9, 1918.   Decided May 7, 1918.

1. Commerce—*Injury While Engaged in "Interstate Commerce"—Switchman.*

   Where an empty car marked "shop" is being switched from the yards of one carrier, where it had stood unloaded for several days, to the interchange track of a connecting carrier for the purpose of returning it to the latter, the owner thereof, for repairs, the switching being wholly within the state, an employe injured while engaged in the operation is not engaged in interstate commerce, though the car was forwarded promptly by its owner to its shop in another state for repair.   (p. 430).

2. Same—*Interstate Commerce—Designation of Car.*

   The mere use of the word "shop" on a car is not equivalent to a designation for haulage in interstate traffic.   (p. 430).

3. Master and Servant—*Safety Appliance Act—Injuries—Right of Action.*

   Though the Federal Safety Appliance Act of March 2, 1893, as amended March 2, 1903 and April 14, 1910, contains no express language conferring a right of action for the death or injury of an employe occasioned by a failure to comply with its requirements, a right of action therefor, nevertheless, is within the contemplation and intendment of the Act.   (p. 431).

4. Commerce—*Safety Appliance Act—Injury While Not Engaged in Interstate Commerce.*

   The requirements of the Federal Safety Appliance Act, as amended, are mandatory and embrace all cars used on any railroad that is a highway of interstate commerce, whether the particular cars are at the time employed in such commerce or not, and includes employes injured through a failure to comply with its terms even though engaged in duties unconnected with interstate commerce.   (p. 431).

5. Master and Servant—*Safety Appliance Act—Handhold.*

   The maintenance of one grab iron or handhold on each side of the car near one end is not a compliance with section 4 of the Federal Safety Appliance Act of March 2, 1893, as the necessity of having such grab iron or handhold upon each side of the car near each end of the car is fairly contemplated by the language of the Act.   (p. 431).

6. SAME—*Safety Appliances—Order of Interstate Commerce Commission.*

The suspension clause of the order of the Interstate Commerce Commission entered on March 13, 1911, pursuant to authority conferred upon the Commission by section 3 of the Act of 1910, did not operate to extend the time for equipping each car with four grab irons on the sides, because the order expressly provides that the extension of time shall not be construed to relieve carriers from complying with the requirements of section 4 of the Act of March 2, 1893.   (p. 431).

7. SAME.

The suspension clause of the order of the Interstate Commerce Commission of March 13, 1911, did not relieve carriers from complying with the positive provision of the same order requiring four sill steps on each car, ''one near each end on each side of the car'', but imposed an immediate duty to equip each car with the number of sill steps therein mentioned. (p. 436).

8. SAME.

The grant to carriers of an extension of time within which to comply with the requirements of the Commission's order of March 13, 1911, was a valid suspension only for the purpose of deferring the standardization of sill steps and other appliances therein mentioned with respect to their exact location, dimensions and manner of application, and did not relieve from the necessity of equipping each car immediately with four secure sill steps of a kind and character reasonably adequate and sufficient to answer the object and purpose contemplated by the Federal Safety Appliance Act.   (p. 436).

9. SAME—*Safety Appliances—Car Equipment—Handhold.*

Though the immediate occasion for passing the laws requiring grab irons was undoubtedly ''for greater security to men in coupling and uncoupling cars'', yet these laws are not confined to the protection of employes only when so engaged.   Carriers are liable to employes in damages whenever the failure to obey the Safety Appliance Acts is the proximate cause of injury to them when engaged in the discharge of duty.   (p. 438).

10. COMMERCE—*Safety Appliance Act—Interstate Carrier—Injury to Employe.*

The liability of an interstate railway company under the Federal Safety Appliance Act to an employe injured through a violation of the commands of those statutes that certain safety appliances be installed upon railway cars used upon a highway of interstate commerce, exists, although the employe when injured was engaged in returning the defective car to its owner for repairs. (p. 438).

Error to Circuit Court, Kanawha County.

Action by Oscar V. Ewing against the Coal & Coke Railway Company. Judgment for plaintiff, and defendant brings error.

*Affirmed.*

*Price, Smith, Spilman & Clay,* for plaintiff in error.

*Surber & Edwards* and *Thos. A. Bledsoe,* for defendant in error.

LYNCH, JUDGE:

Plaintiff, an "extra" brakeman employed by the Coal & Coke Railway Company, a common carrier engaged in interstate commerce, though its line of railroad is wholly within this state, sued the defendant and recovered judgment for an injury received on the night of November 12-13, 1915, while engaged in switching an empty gondola coal car, the property of the Kanawha & Michigan Railway Company, from the Charleston yards of the defendant to the interchange track of the defendant and the Kanawha & Michigan Railway Company. The car was delivered empty to defendant on or about November 1, 1915, after its return from an interstate trip to Ohio. While standing in defendant's yards, it was condemned as being unfit for use because of a defective end-sill and marked "shop" by the car inspector acting for and in behalf of each of the two companies; and the switching from which the injury occurred was for the purpose of returning it to its owner, the Kanawha & Michigan Railway Company, and within the next two days it was forwarded by that company to Hobson, Ohio, for repairs.

The car was equipped on each end with grab irons and on each side at diagonal corners with grab irons and sill steps, and plaintiff in the course of the switching operations attempted to board the car at a point on the side near the end where there were not, and never had been, grab irons and a sill step. Owing to the darkness, he failed to note their absence at that point, and, acting upon the supposition that the car was equipped with these appliances, he undertook to place his foot in the sill step and to catch the grab irons with his right

hand, and missing both, his foot fell to the rail of the track and one of the wheels of the car passed over it severely bruising it and crowding the bones together, thereby destroying or limiting his capacity to perform manual labor.

The first contention of the plaintiff in error, defendant below, is that the carrier at the time of the injury was engaged in, and plaintiff employed in, interstate commerce, and that therefore the action should have been brought under the Federal Employers' Liability Act. This contention cannot prevail. Admitting that, if the switching had occurred as part of a through movement of the empty car for repair from one state to another, defendant would have been engaged in interstate commerce, *Chicago etc. R. Co.* v. *Wright,* 239 U. S. 548; *North Car. R. Co.* v. *Zachary,* 232 U. S. 248, yet the facts of the present case do not show that the work done was of that nature. The car was not moving under a through bill of lading or such other designation as would indicate an interstate routing. The mere presence of the word "shop" on the car is not equivalent to a designation for haulage to some interstate point. When defendant returned the car to the connecting carrier and owner, whose dominion over it was complete, defendant did not know and had no means of knowing whether the owner would repair the car in its own yards or send it to one of its shops, as it later did; nor that the car might not stand indefinitely in the yards of its owner without anything being done to it. The character of the transportation, whether interstate or intrastate, must be determined in the light of a reasonable construction given to the word "shop" at the time of the injury, not at any later time; and at that moment plaintiff and his employer, the defendant, had no direction other than to return the car to the Kanawha & Michigan Railway Company, clearly an intrastate movement.

This case is unlike the cases of *Delk* v. *St. Louis & S. F. R. Co.,* 220 U. S. 580; *Great Northern Ry. Co.* v. *Otos,* 239 U. S. 349; and *Chicago etc. R. Co.* v. *Wright, supra.* In the Delk case, the car in question was still loaded with interstate freight when set aside for repairs and had not yet arrived at its destination, hence still bore some relation to interstate

commerce. The Otos case also involved a car loaded with interstate freight, and in addition it was switched in connection with other cars which were clearly engaged in interstate commerce. In the Wright case, the engine was being taken from one state to a repair shop in another and was moving directly to an interstate destination under directions clear and explicit. But in the case now reviewed, there was at the time of the injury no means of ascertaining and apparently no one could foresee what course the Kanawha & Michigan would pursue with reference to it. The case comes more nearly under the principles laid down in *Ill. Cent. R. Co.* v. *Behrens,* 233 U. S. 473. See also *Lehigh Valley R. Co.* v. *Barlow,* 244 U. S. 183 and *C. B. & Q. R. Co.* v. *Harrington,* 241 U. S. 177.

It seems clear, therefore, that plaintiff was not at the time of the accident engaged in interstate commerce, and it is the work that he is doing at the time of the injury that determines the nature of his employment, not what he was doing just before or what he intends to do within a short time. *Ill. Cent. R. Co.* v. *Behrens, supra; Shanks* v. *Delaware, L. & W. R. Co.,* 239 U. S. 556. Hence plaintiff was correct in not basing his case upon the Federal Employers' Liability Act.

The next question presented for consideration relates to the Federal Safety Appliance Act of 1893, as amended in 1903 and 1910, of which the following sections and extracts from sections are material: Act March 2, 1893, § 4 (U. S. Comp. Stat. 1916, § 8608). "That from and after the first day of July, eighteen hundred and ninety-five, until otherwise ordered by the Interstate Commerce Commission, it shall be unlawful for any railroad company to use any car in interstate commerce that is not provided with secure grab irons or handholds in the ends and sides of each car for greater security to men in coupling and uncoupling cars."

The amendment of March 2, 1903, § 1 (U. S. Comp, Stat., § 8613), is important only in that it extended the requirements of the act of 1893 relating to train brakes, automatic couplers, grab irons, etc., "to all trains, locomotives, tenders, cars and similar vehicles used on any railroad engaged in interstate commerce, * * and to all other locomotives, tenders,

cars, and similar vehicles used in connection therewith," with an exception which does not concern us now.

Sections 2 and 3 of the amendment of April 14, 1910, (U. S. Comp. Stat. 1916, §§ 8618, 8619) are: § 2; " * * All cars must be equipped with secure sill steps and efficient hand brakes; all cars requiring secure ladders and secure running boards shall be equipped with such ladders and running boards, and all cars having ladders shall also be equipped with secure handholds or grab irons on their roofs at the tops of such ladders. * * "

§ 3: "That within six months from the passage of this Act the Interstate Commerce Commission, after hearing, shall designate the number, dimensions, location, and manner of application of the appliances provided for by section two of this Act and section four of the Act of March second, eighteen hundred and ninety-three, and shall give notice of such designation to all common carriers subject to the provisions of this Act by such means as the commission may deem proper, and thereafter said number, location, dimensions, and manner of application as designated by said commission shall remain as the standards of equipment to be used on all cars subject to the provisions of this Act, unless changed by the order of said Interstate Commerce Commission, to be made after full hearing and for good cause shown; and failure to comply with any such requirement of the Interstate Commerce Commission shall be subject to a like penalty as failure to comply with any requirement of this Act: Provided, that the Interstate Commerce Commission may, upon full hearing and for good cause, extend the period within which any common carrier shall comply with the provisions of this section with respect to the equipment of cars actually in service upon the date of the passage of this Act."

Before considering the principal question of the case, whether the Safety Appliance Act as amended required the placing of grab irons and a sill step at the point where plaintiff attempted to board the car, there are certain preliminary points to be noted.

None of the acts contains express language conferring a right of action for the death or injury of an employe, but

the existence of the right of action has rarely been doubted, and finally was conclusively settled in *Texas & Pac. Ry. Co.* v. *Rigsby,* 241 U. S. 33.

With respect to a claim arising from injury caused by an alleged failure to conform to the requirements of the Federal Safety Appliance Act, it is unnecessary to discuss the questions whether the car was being used in interstate commerce or whether the injured employe was employed in interstate commerce at the time of the injury. The requirements of that act are mandatory and embrace all cars used on any railroad that is a highway of interstate commerce, whether the particular cars are at the time employed in such commerce or not. *Southern Ry. Co.* v. *U. S.,* 222 U. S. 20; *Southern Ry. Co.* v. *Railroad Commission of Indiana,* 236 U. S. 439; *Texas & Pac. Ry. Co.* v. *Rigsby, supra.* It applies even where the car was not engaged in transportation but was being taken to a shop for repairs; *Texas & Pac. R. Co.* v. *Rigsby, supra;* and includes employes injured through a failure to comply with its terms even though engaged in duties unconnected with interstate commerce. *Texas & Pac. Ry. Co.* v. *Rigsby, supra; San Antonio Ry. Co.* v. *Wagner,* 241 U. S. 476. And the requirements of the act that secure grab irons be placed on the ends and sides of cars is not satisfied by equivalents or by anything less than literal compliance with what is prescribed. *St. Joseph & G. I. R. Co.* v. *Moore,* 243 U. S. 311.

Turning now to the important point in the case, had defendant complied with the requirements of the Safety Appliance Act as amended? The original act of 1893 required grab irons "in the ends and sides of each car for greater security to men in coupling and uncoupling cars." The car causing the injury was equipped with grab irons at each end and with grab irons and a sill step near one end on each side but not near both ends on each side of the car, i. e., only at its diagonal corners. Plaintiff was injured because of his mistaken belief that there were grab irons and a sill step on each side of the car near each of its four corners. The language of section 4 of that act in requiring grab irons on the sides and ends clearly makes it obligatory to have at least

one on each end and on each side. *U. S.* v. *B. & O. R. Co.,* 184 Fed. 94. With this minimum requirement defendant had complied. But whether grab irons at each end and ,on each side at diagonal corners of a car—the minimum requirement —satisfies the demand of the statute expressed in the phrase "in the ends and sides of each car" raises a question of construction which has rarely been discussed in the cases.

As before stated, at least one grab iron or set of grab irons on each end and one on each side must exist to meet the minimum requirement of the statute expressed by the phrase, "in the ends and sides of each car"; the construction for which defendant contends. But this construction wholly ignores the further qualifying phrase, "for greater security to men in coupling and uncoupling cars." The two phrases as constituent elements of the act must be read together and the number required by the section determined in part at least with some reference to the safety and needs of those whose service requires them to engage in the extra-hazardous undertaking of operating car couplers.

Section 2 of the act of 1893, as amended in 1903, made it unlawful for any carrier engaged in interstate commerce to haul or permit to be hauled or used on its line any car "not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars." The ordinary practice is for uncoupling levers on the adjoining ends of two cars to be located upon opposite sides, so that a brakeman may un-·couple the cars from either side. *Central Vermont Ry. Co.* v. *U. S.,* 205 Fed. 40. Such is now the express requirement of the Interstate Commerce Commission under its order of March 13, 1911. But if grab irons are placed only at that point on each side of the car nearest the handle of the uncoupling lever, the car next coupled to it may be without grab irons and a sill step on the same side at the end nearest to it, and will have them only at the far end on the same side. Hence, when a brakeman, after uncoupling a car, desires to remount, he can do so only on the car whose lever he used; but if he should wish to remount the adjoining car, as where it remains part of the train and the other does not, he

would often necessarily be obliged to hasten to some other part of the car where grab irons are placed and mount it there, a dangerous choice to impose upon him at any time, and especially on a dark night. Where the company has seen fit to install a double lever on each end of each car, as it may do, this reasoning applies with even greater force. Hence in order to obviate such difficulty, it seems that a reasonable construction of section 4 of the act of 1893 requires grab irons not only on each side at diagonal corners of the car but on each side at each of the four corners.

Though, as observed, this phase of the act has rarely, if at all, been considered by the courts in any reported case discovered upon this investigation after a diligent search, the interpretation given is not without authoritative support in at least one case, not reported and not reversed, so far as we have been able to ascertain. The case referred to is, *United States* v. *Wabash-Pittsburg Terminal Railway Company*, Appendix G., page 660, Thornton, Fed. Emp. Liability & Safety Appliance Acts (Second Ed.). This was an action of assumpsit brought by the plaintiff to recover from the railroad company for a violation of the act of Congress relating to the equipment of cars used on a highway of interstate commerce and especially that provision of the act here in question, relative to "grab irons or handholds on the ends and sides of each car for greater security to men in coupling and uncoupling cars"; and the court held in the syllabus: "The maintenance of one grab iron or handhold on each side of the car near the 'B' end is not a compliance with the Federal Safety Appliance Act, as the necessity of having such grab iron or handhold upon each side of the car near each end of the car is fairly contemplated by the very language of the Act."

When this decision was rendered, November 3, 1909, the Interstate Commerce Commission did not possess the authority, conferred by § 3 of the act passed in 1910, to "designate the number, dimensions, location and manner of application of the appliances provided for by section two of this act and section four of the Act of March second, eighteen hundred and ninety-three", yet when the Commission received the

authority so to do, it entered, in the exercise of that author-
ity, an order, March 13, 1911, requiring, among other things,
later considered, four side grab irons, "one near each end on
each side of the car", and four sill steps, "one near each end
on each side of the car", thus interpreting the act in accord-
ance with the plain import of its terms, and as we have in-
terpreted them.

Section 3 of the act of 1910 further provided that: "The
Interstate Commerce Commission may, upon full hearing and
for good cause, extend the period within which any common
carrier shall comply with the provisions of this section with
respect to the equipment of cars actually in service upon the
date of the passage of this Act." Pursuant to that authority,
the Commission's order of March 13, 1911, and a subsequent
order granted an extension of time till July 1, 1917 "to
change and apply" the appliances "to comply with the
standards prescribed in said order", unless the car is shopped
for work amounting to practically rebuilding the body of the
car.    There is, however, a further provision in the order,
"that the extension of time herein granted is not to be con-
strued as relieving carriers from complying with the pro-
visions of section 4 of the Act of March 2, 1893, as amended
* * March 2, 1903."

Did the Commission's order of March 13, 1911, operate to
extend the time for equipping each car with four grab irons
on the sides until July 1, 1917? In our judgment it did not.
The order expressly provides that the extension of time shall
not be construed to relieve carriers from complying with the
requirements of section 4 of the act of 1893, and that section
under the construction we have given it requires grab irons
on each side near each end.

What has been said heretofore in this opinion has re-
lated solely to the duty under the Safety Appliance Act to
equip each car with grab irons on the sides near the four
corners.    Since the injury was due to the absence of both
grab irons and sill steps, it is necessary to discuss the re-
quirements of the act with reference to the latter.    Sill steps
were not required by the original act of 1893, nor by the
amendment of 1903.    Section 2 of the act of 1910, however,

provided that "All cars must be equipped with secure sill steps." The question at once presents itself whether the Commission's suspension order of March 13, 1911, did not relieve defendant from the necessity of providing sill steps till July 1, 1917. The effect of the suspension order upon the requirements of § 2 of the act of 1910 has been discussed in at least three cases and the general result of those holdings is that the order merely operated to relieve from the necessity of standarization till that date. *Ill. Cent. R. Co.* v. *Williams,* 242 U. S. 462. In the case cited, a case arising out of an injury suffered by a brakeman due to an insecurely fastened grab iron on the roof of a car at the top of the ladder and required by § 2 of the act of 1910 to be secure, it was contended that the Commission's order of March 13, 1911, suspended the operation of that section until the later date therein set out. But the court held otherwise, saying that the Commission did not have the power to suspend the operation of § 2 in so far as it required the appliances therein designated to be "secure", but merely to determine the length of time which the carrier should be allowed in which to conform to the standardization prescribed by the order. The court said: "It is equally clear that the purpose of the 3d section is to require that the safety appliances 'provided for by § 2 of the act' shall ultimately conform to a standard to be prescribed by the Interstate Commerce Commission; that is, that they shall be standardized, shall be of uniform size and character, and, so far as ladders. and handholds are concerned, shall be placed as nearly as possible at a corresponding place on every car so that the employees who work always in haste, and often in darkness and storm, may not be betrayed, to their death or injury, when they instinctively reach for the only protection which can avail them when confronted by such a crisis as often arises in their dangerous service. * * * To change these safety appliances on all the cars in the country from what they were as contemplated by § 2,— 'secure', but differing 'in number, dimensions, location and manner of application,'—to what they must be when standardized to meet the requirements provided for in § 3, was regarded by Congress as a work so great and so expensive

that it wisely committed to the informed discretion of the Interstate Commerce Commission the power and duty of determining the length of time which the carriers should be allowed in which to accomplish it. To give this discretion to the Commission is the function, and the only function, of the proviso of § 3, and the claim that, by construction, power may be found in it to suspend § 2, is too forced and unnatural to be seriously considered." See also, *Coleman* v. *Ill. Cent. R. Co.,* 132 Minn. 22, and *Cook* v. *Union P. R. Co.* (Ia.), 158 N. W. 521.

All three cases last cited deal with the insecurity of existing appliances. In this case, however, it is not contended that the existing sill steps were insecure, but that they were not present in sufficient numbers. The suspension order of the Interstate Commerce Commission with reference to all cars in use on the first day of July, 1911, to which class the car causing plaintiff's injury belonged, did not, we think, relieve carriers from complying with its order of March 13, 1911, to provide four sill steps, but imposed an immediate duty to equip each car with the number of sill steps therein mentioned. As stated in *Ill. Cent. R. Co.* v. *Williams, supra,* the granting to the carriers of an extension of time to July 1, 1917, was a valid suspension only for the purpose of deferring the standardization of sill steps and other appliances with respect to their exact location, dimensions and manner of application and did not relieve from the necessity of equipping each car immediately with four secure sill steps of some kind reasonably adequate or sufficient to answer the object and purpose contemplated by the Acts of the Congress.

The further question then arises, was the failure to provide grab irons at that point on the car where the accident occurred a proximate cause of the injury? Plaintiff's mistaken belief that both grab irons and a sill step were affixed at that point resulted in the crushing of his foot between the rail and the wheels of the car. If the grab irons had been there, even though the sill step was not, there is a reasonable chance that he would have been able to steady himself with their help to such an extent that his foot might not have fallen to the rail, but he was deceived by the absence of both appliances

prescribed.  Furthermore, if the carrier had complied with
the requirements of the act with respect to grab irons, as we
construe it, and had placed grab irons on that corner, it
would likely have added a sill step, irrespective of the Com-
mission's order.   Hence we think the failure to provide the
grab irons alone, and certainly the failure to provide grab
irons and a sill step at that point, may fairly be said to have
contributed to the injury; and therefore was a proximate
cause thereof.

But it is contended that the grab irons required by the act
of 1893, as amended in 1903, were "for greater security to
men in coupling and uncoupling cars" and that their absence
cannot be complained of by one not so engaged at the time of
his injury.   The case of *Texas & Pac. Ry. Co.* v. *Rigsby,*
*supra,* avoided the decision of that question by relying upon
§ 2 of the act of 1910, but the later case of *Louisville & N.*
*R. Co.* v. *Layton,* 243 U. S. 617, lays down a rule sufficiently
broad, we think, to protect the plaintiff in this case.   There
the court sustained a judgment for a switchman injured while
at work on top of a car due to the carrier's failure to equip
the cars with automatic couplers, as required by law, and
said: "While it is undoubtedly true that the immediate oc-
casion for passing the laws requiring automatic couplers was
the great number of deaths and injuries caused to employees
who were obliged to go between the cars to couple and un-
couple them, yet these laws as written are by no means con-
fined in their terms to the protection of employees only when
so engaged.   The language of the acts and the authorities
we have cited make it entirely clear that the liability in
damages to employees for failure to comply with the law
springs from its being made unlawful to use cars not equip-
ped as required,—not from the position the employee may
be in, or the work which he may be doing at the moment
when he is injured.   This effect can be given to the acts and
their wise and humane purpose can be accomplished only by
holding, as we do, that carriers are liable to employees in
damages whenever the failure to obey these Safety Appliance
Laws is the proximate cause of injury to them when en-
gaged in the discharge of duty.   The jury found that the

plaintiff's case came within this interpretation of the statute, and the judgment of the Supreme Court of Georgia must be affirmed.''

Nor is it any defense on the part of the railroad company that the car was being returned for repairs at the time of the accident. Section 4 of the act of 1910 relieves the carrier from liability for penalties imposed by the act while hauling the car to the nearest available point for repair, where the car has been properly equipped and such equipment has become defective or insecure while used by the carrier upon its line of railroad. But the section further provides that nothing therein ''shall be construed to relieve such carrier from liability in any remedial action for the death or injury of any railroad employee caused to such employee by reason of or in connection with the movement or hauling of such car with equipment which is defective or insecure or which is not maintained in accordance with the requirements of this Act and the other Acts herein referred to.'' See also *Great Northern R. Co. v. Otos*, 239 U. S. 349; *Texas & Pac. R. Co. v. Rigsby, supra.*

The defendant introduced as witness in its behalf W. A. Brown and by him offered to prove the manner of equipping gondola cars built and in general use by railroad operators prior to the year 1911 as regards handholds or grab irons and sill steps; and whether the car causing the injury was adequately equipped for the protection of employes handling it; whether grab irons on cars of the class to which the car inflicting the injury belonged were properly placed to aid employes in coupling and uncoupling it with or from other cars, or were located for the convenient use of the employes for other purposes. This offer was refused and the witness was not permitted to testify to the matters as to which he was interrogated, and this refusal is assigned and relied on as erroneous and prejudicial. But in view of our holding upon the question of defendant's liability to plaintiff for failing to comply with the act as we have construed and interpreted its provisions, the proposed testimony is immaterial in any aspect of the case.

Defendant's counsel also assign as erroneous and preju-

dicial the permission granted to plaintiff over their objection to elicit from the witness Brown on cross examination information as regards the number and location of grab irons on the sides of the cars of the same class as the car in question, equipped after the act of April 14, 1910, amendatory of the original Safety Appliance Act, had become effective by its terms; and as to how this type of car should have been equipped to comply with that act according to the standardized form prescribed by the Interstate Commerce Commission's order of March 13, 1911, as to the number and location of sill steps; also whether after July 1, 1911, the Kanawha & Michigan Railway Company and other like carriers by railroad began to re-equip the cars owned by each of them in accordance with the Commission's order of March 13, 1911; and whether after that date and prior to November 13, 1915, the date of the injury to plaintiff, the Kanawha & Michigan Railway Company did re-equip cars of the same series as the car in question accordingly as required by such order; and of the witness I. N. Kilbaugh, a witness for defendant, over like objection, whether since the date of such order carriers by railroad generally had attempted to comply with that order as to the number, dimensions, location and manner of application of safety appliances and that a majority of such carriers had so complied, at least to the extent of about three-fourths of their cars used in freight transportation.

The theory upon which the testimony was offered by defendant and rejected in chief and elicited by plaintiff on cross examination of the same witnesses certainly is not apparent, nor is there much said by counsel upon the subject, the argument for defendant being confined to the mere general observation that if the order of the Interstate Commerce Commission of March 13, 1911, "was not in force as to this car, and we think it is clear that it was not, we cannot understand how such testimony could be relevant * * * and would mislead the jury as it would naturally conclude if such testimony was admitted that a car not equipped in accordance with the order was not properly equipped." But we cannot concur in the conclusion reached by counsel that the order of March 13, 1911, did more than extend the time within which

carriers by railroad should be privileged without liability to standardize the safety appliances as required by the Interstate Commerce Commission. Not only was that the extent and object of the order but the Interstate Commerce Commission had not authority to suspend the operation of the Federal Act as to safety appliances. Its power was limited in express terms to the prescription of the location and dimensions of the appliances for the purpose of standardization of car equipment for the protection of employes.

Plaintiff cannot reasonably complain of the failure to grant his request for instructions 1, 2, 3 and 4 because he recovered the judgment notwithstanding such failure. Complaint is made by defendant of instructions 5 and 7, requested by plaintiff and given; because No. 5 is based upon the breach of the duty to provide a sill step on that part of the car at which plaintiff undertook to board it; and No. 7 upon the breach of the duty to provide a sill step and grab irons thereat, with direction to find for him if the jury find that the absence of the sill step, according to No. 5, and the absence of the sill step and grab irons, according to No. 7, was the proximate cause of the injury, if the jury believe from the evidence that he was not guilty of some negligent act or acts on his own part which directly contributed to or caused his injury, in which event the jury should find for defendant. The ground of objection to each of these instructions seems to be that the Interstate Commerce Commission had by its order of March 13, 1911, extended the time within which carriers by railroad should standardize their cars to comply with such order. As that phase of the case has already been treated, it is unnecessary to discuss it further.

Our attention is not directed to any fatal defects in instructions 6, 8, and 9 and we perceive none. They harmonize with what has been said in regard to other phases of the case. No. 6 is the instruction usually given in actions for injuries chargeable to the breach of the master's duty to exercise reasonable care to furnish his employes with a reasonably safe place in which to work and reasonably safe appliances with which to perform the duties assigned to him, the breach of which duties is averred in the declaration as

one of the bases of the recovery sought by the plaintiff. As that pleading apparently is sufficient upon demurrer and as no defect therein is pointed out by counsel, the ruling on the demurrer is approved. The result is to affirm the judgment.

*Affirmed.*