ILLINOIS CENTRAL RAILROAD COMPANY ET AL. *v.* WILLIAMS.

ERROR TO THE SUPREME COURT OF THE STATE OF MISSISSIPPI.

No. 637. Argued December 6, 1916.—Decided January 8, 1917.

Section 2 of the supplementary Safety Appliance Act of April 14, 1910, c. 160, 36 Stat. 298, requiring interstate railway carriers to equip their cars with secure running-boards, ladders, and hand-holds or grab-irons, became effective July 1, 1911.

The purpose of § 3 of the act is to standardize the appliances required by § 2, and the purpose of the proviso in it is to confer authority

on the Interstate Commerce Commission to extend the time within which the carriers may conform to the established standards, but it does not authorize the Commission to change the date upon which § 2 became effective.

72 So. Rep. 158, affirmed.

THE case is stated in the opinion.

*Mr. Charles C. LeForgee,* with whom *Mr. Blewett Lee, Mr. Charles N. Burch* and *Mr. Robert B. Mayes* were on the briefs, for plaintiffs in error.

*Mr. M. F. Harrington* and *Mr. William H. Watkins* for defendant in error.

MR. JUSTICE CLARKE delivered the opinion of the court.

It will contribute to brevity in this opinion to designate the parties as they were in the state circuit court, the defendant in error as plaintiff and the railroad companies as defendants.

The plaintiff, a switchman in the employ of the defendants, was in the act of mounting, by means of a ladder, to the top of a box car to set the brake, when the hand hold or grab iron placed at the top of the ladder, and intended to be fastened securely to the roof of the car, gave way, causing him to fall to the ground and sustain injuries, for which he instituted suit in a circuit court of Mississippi, and recovered a judgment, which was affirmed by the Supreme Court of the State. This judgment is now here for review on writ of error.

Counsel for the defendants concede that the plaintiff pleaded and proved a case which entitles him to recover under the provisions of the supplement to the Federal Safety Appliance Act, approved April 14, 1910, if § 2 of that act was in effect at the time the accident to the plaintiff occurred on the night of March 15th, 1913; but they

claim that this section of the act was not in effect at that
time, because it had been suspended until July 1st, 1916,
by an order of the Interstate Commerce Commission,
issued on March 13th, 1911, under the authority contained
in the proviso of § 3 of the act.

Thus the sole question presented for decision is, Does
the order issued by the Interstate Commerce Commission
on March 13th, 1911, suspend the provisions of § 2 of the
act under discussion until July 1st, 1916?

To answer this question requires an examination of
§§ 2 and 3 of the Act of April 14, 1910, and of the order of
the Interstate Commerce Commission of March 13th,
1911.

Section 2 of the act provides that on and after July 1st,
1911, "All cars" used by any common carrier subject to
the act, "requiring secure ladders and secure running
boards shall be equipped with such ladders and running
boards, and all cars having ladders shall also be equipped
with secure hand holds or grab irons on their roofs at the
tops of such ladders," and it makes it unlawful to use cars
not so equipped.

A box car could not properly be used without a secure
ladder and since, by its terms, all cars having ladders must
be equipped with secure hand holds, the application of
this section (if it was not suspended) to the case at bar,
the neglect of its requirements, and the liability of the
defendants to the plaintiff for the result to him of such
neglect are too clear for discussion. *Texas & Pacific Ry.
Co. v. Rigsby*, 241 U. S. 33.

Section 3 of the act provides that within six months
from the passage of the act the Interstate Commerce
Commission "shall designate the number, dimensions,
location, and manner of application of the appliances
*provided for by section two of this Act*" and shall give notice
of such designation to all common carriers subject to the
provisions of the act by such means as the Commission

may deem proper, and "thereafter said number, location, dimensions, and manner of application as designated by said commission, shall remain as the standards of equipment to be used on all cars subject to the provisions of this Act;" and failure to conform its equipment to such standards shall subject the neglecting carrier to like penalty as failure to comply with any requirements of the act. Then follows this proviso, upon which the defendants rely, viz:

"*Provided,* That the Interstate Commerce Commission may, upon full hearing and for good cause, extend the period within which any common carrier *shall comply with the provisions of this section* with respect to the equipment of cars actually in service upon the date of the passage of this act."

Pursuant to the command of this third section, the Interstate Commerce Commission, on March 13th, 1911, issued an order designating "the number, dimensions, location, and manner of application of the appliances provided for by section 2 of the act," and specifically describing the size, character, and location of ladders on "freight-train cars" and of hand holds to be maintained at the tops of such ladders. By the terms of this order carriers were granted an extension of five years from July 1st, 1911, in which to bring such safety appliances into compliance with the standards by it prescribed.

The claim of the defendant railway companies with respect to these two sections is built up wholly upon the assertion, it cannot properly be called argument, that because, in the part of § 3 just quoted, reference is made to § 2 for a description of the safety appliances to be standardized, therefore the whole of § 2 must be treated as so incorporated into § 3 as to be comprehended within the expression of the proviso giving power to the Interstate Commerce Commission to extend the period within which any common carrier "*shall comply with the provisions of*

*this (the third) section,"* etc., and that § 2 was therefore suspended until July 1st, 1916, by the Commission's order of March 13th, 1911.

That this strained and artificial construction of the section cannot be allowed, may be made clear by a brief consideration of the terms and purposes of the two sections of the act.

The congressional purpose in enacting § 2 of the act is very plain. At the time the act was passed railroad carriers had in service many box cars, requiring for their proper use secure ladders and secure hand holds or grab irons on their roofs at the tops of such ladders, and the purpose of this section clearly is to convert the general legal duty of exercising ordinary care to provide such safety appliances and to keep them in repair, into a statutory, an absolute and imperative duty, of making them "secure" and to enforce this duty by appropriately severe penalties. *Chicago, Burlington & Quincy Ry. Co.* v. *United States*, 220 U. S. 559.

It is equally clear that the purpose of the third section is to require that the safety appliances "provided for by section two of this Act" shall ultimately conform to a standard to be prescribed by the Interstate Commerce Commission, that is, that they shall be standardized, shall be of uniform size and character, and so far as ladders and hand holds are concerned, shall be placed as nearly as possible at a corresponding place on every car so that employees who work always in haste, and often in darkness and storm, may not be betrayed, to their injury or death, when they instinctively reach for the only protection which can avail them when confronted by such a crisis as often arises in their dangerous service. It is for such emergencies that these safety appliances are provided,—for service in those instant decisions upon which the safety of life or limb of a man so often depends in this perilous employment,—and therefore this law requires

that ultimately the location of these ladders and hand holds shall be absolutely fixed so that the employee will know certainly that night or day he will find them in like place and of like size and usefulness on all cars, from whatever line of railway or section of the country they may come. This highly important and humane purpose must not be defeated by finesse of construction such as is pressed upon our attention in the argument of this case.

To this primary purpose of protecting the life and limb of employees is added the purpose of protecting the lives of passengers and of securing the safety of property by requiring uniform standards as to other equipment of cars, such as coupling appliances, brakes and the like.

To change these safety appliances on all the cars in the country from what they were as contemplated by § 2,— "secure" but differing "in number, dimensions, location, and manner of application,"—to what they must be when standardized to meet the requirements provided for in § 3, was regarded by Congress as a work so great and so expensive that it wisely committed to the informed discretion of the Interstate Commerce Commission the power and duty of determining the length of time which the carriers should be allowed in which to accomplish it. To give this discretion to the Commission is the function, and the only function, of the proviso of § 3 and the claim that, by construction, power may be found in it to suspend § 2 is too forced and unnatural to be seriously considered.

This reading of the two sections makes them stand together as an expression of a consistent congressional purpose "to promote the safety of employees and travelers on railroads" on and after July 1st, 1911, by requiring that the safety appliances described in § 2 of the act shall be secure and efficient from that date, and by requiring as § 3 provides that these appliances shall be brought as · speedily as may be to a uniform standard of location, size

and usefulness, to be prescribed by the Interstate Commerce Commission.

While the question we have considered has not been presented to this court before in precisely the form in which we have it here, yet § 2 of the act was treated by this court as in full force as of September 4, 1912, in *Texas & Pacific Ry. Co. v. Rigsby*, 241 U. S. 33, and the Supreme Court of the State of Minnesota in *Coleman* v. *Illinois Central R. R. Co.*, 132 Minnesota, 22, and the Supreme Court of Iowa in *Cook* v. *Union Pacific Ry. Co.*, 158 N. W. Rep. 521, while arriving at their conclusions by somewhat different analyses of the sections of the Act of April 14, 1910, have given to them precisely the meaning and effect which we are giving to them in this decision. It results that the judgment of the Supreme Court of Mississippi is

*Affirmed.*