## SHIELDS *v.* ATLANTIC COAST LINE RAILROAD CO.

No. 150.   Argued January 19, 1956.—Decided February 27, 1956.

*Truman M. Hobbs* argued the cause for petitioner. With him on the brief was *M. R. Nachman, Jr.*

*Norman C. Shepard* argued the cause and filed a brief for respondent.

*Robert W. Ginnane* and *C. H. Johns* filed a brief for the Interstate Commerce Commission, as *amicus curiae*, supporting respondent.

MR. JUSTICE MINTON delivered the opinion of the Court.

Petitioner, an independent contractor in the business of unloading gasoline, was instructed by the consignee to unload a tank car of gasoline which had been hauled by respondent Atlantic Coast Line and which was located at the time on a siding in respondent's freight yards. In order to release the gasoline through a hose attached to the bottom of the car, it was necessary to go to the dome on top of the car, remove the dome cap, and open a valve inside the dome. While petitioner and his helper were engaged in opening the valve, the board on which they were standing broke and petitioner fell, sustaining injuries. There is no dispute that the board was defective. It was a wooden board over seven feet long attached to the side of the tank near the top just below the dome by means of two triangular steel braces extending from the side of the tank at either end of the board.

The question presented here is whether this device, which for convenience we shall call a dome running board, is a safety appliance within the meaning of §§ 2 and 3 of the Safety Appliance Act of 1910. Act of April 14, 1910, c. 160, §§ 2 and 3, 36 Stat. 298, 45 U. S. C. §§ 11 and 12.

Petitioner brought suit in the District Court, alleging in one count of his amended complaint absolute liability for a violation of the Act and in a second count common-law negligence. The jury returned a general verdict in his

favor.   The Court of Appeals reversed and remanded for a new trial on the negligence count alone, holding that the trial court erred in instructing that the dome running board was a safety appliance.   220 F. 2d 242.[1]   We granted certiorari because of the importance of the questions raised as to the proper interpretation of the Safety Appliance Act.   350 U. S. 819.

Section 2 of the Safety Appliance Act of 1910 provides in part:

> ". . . all cars requiring secure ladders and secure running boards shall be equipped with such ladders and running boards . . . ."

Section 3 provides:

> "That within six months from the passage of this Act the Interstate Commerce Commission, after hearing, shall designate the number, dimensions, location, and manner of application of the appliances provided for by section two . . . and thereafter said number, location, dimensions, and manner of application as designated by said commission shall remain as the standards of equipment to be used on all cars subject to the provisions of this Act, unless changed by an order of said Interstate Commerce Commission . . . and failure to comply with any such requirement of the Interstate Commerce Commission shall be subject to a like penalty as failure to comply with any requirement of this Act . . . ."[2]

Under the authority of § 3, the Commission in 1911 promulgated regulations still in force providing in detail for

---

[1] The action against Southern Railway Co., a co-defendant, as delivering carrier of the car was dismissed.

[2] Section 3 as it appears in the United States Code omits, presumably as executed, the language containing the statutory command to the Commission to make its original standardization regulations. 45 U. S. C. § 12.

one running board running around the perimeter, or at least the full length of the sides, of tank cars.[3] Such a board enables a trainman to walk the length of a tank car between cars adjoining it on either end. The regulations make no mention whatever by any name of dome running boards. Petitioner nevertheless contends that the dome running board is a required running board affording him protection under § 2.

The obvious purpose of a dome running board is to provide a secure flooring for those who must perform operations in connection with the tank car dome. Clearly, the dome running board has major importance in loading and unloading operations. But a railroad man of over twenty-five years' experience testified that it also may be used to stand on in order to pass hand signals or repair minor troubles occurring while the train is en route. The dome running board is an integrated part of the exterior equipment of a tank car;[4] it functions as a permanently attached outside "floor" near the dome of the car. The testimony showed that railroad men, including respondent's employees, often refer to the dome running board as a running board. We hold that it comes within the meaning of the term "running boards" as used in § 2.

The fact that the Commission in its 1911 regulations under § 3 has not specified uniform standards for dome running boards is not a binding administrative determination that they are not running boards for the purposes of § 2. The reason for the omission is apparently the Commission's view that only appliances affording safety while the train is moving need be standardized. But

---

[3] 49 CFR §§ 131.8 (b), 131.9 (c). 49 CFR § 131.7 covers "Tank cars with side platforms" and contains no provision for "running boards." The car in question here does not come within § 131.7.

[4] See Car Builders' Cyclopedia (18th ed. 1949–1951), 249–254, especially the diagrams, at 252–253, of a tank car with a dome running board, there called a "dome platform," similar to the present car.

there is no showing that the regulations purport to exhaust by implication each category of statutory appliances listed in § 2. Omission of dome running boards of itself shows no more than that the Commission has not standardized all possible running boards within § 2. *Davis* v. *Manry,* 266 U. S. 401, is consistent with our view. There the Court itself interpreted the language in § 2 requiring grab irons "on their roofs" of "cars having ladders" to apply only to cars having roofs. It then pointed to the Commission's failure to standardize a grab iron over a standardized ladder on a tender without a roof only as a supporting "practical construction" of the section. Moreover, the Commission in that case, having standardized the ladder, had no alternative but to interpret the statutory word "roofs" by either standardizing a grab iron or not standardizing it. Here no such practical construction is implied by the failure to standardize.

Even if the dome running board be properly characterized as a running board, respondent contends that, since § 2 refers to "cars requiring . . . secure running boards," the Commission's failure to standardize dome running boards under § 3 constitutes an administrative determination that they are not required within the meaning of § 2. The purpose of § 3 was to provide uniformity in the location and characteristics of those appliances upon which railroad men, working "always in haste, and often in darkness and storm," must "instinctively" rely in the hazards of their employment. *Illinois Central R. Co.* v. *Williams,* 242 U. S. 462, 466.[5] Effectuation of such a purpose would require standardization of running boards which extend the length of train cars. But considerations of administrative expertise relevant to § 3 are not equally applicable to the effectuation of the purpose of § 2. The

---

[5] See also H. R. Rep. No. 37, 61st Cong., 2d Sess.; S. Rep. No. 250, 61st Cong., 2d Sess. 3.

purpose of the latter section was "to convert the general legal duty of exercising ordinary care to provide" safety appliances on cars "requiring [them] for their proper use" into a "statutory, an absolute and imperative duty, of making them 'secure.'" *Illinois Central R. Co.* v. *Williams, supra.* The purpose of § 3 is to standardize the appliances required by § 2. But it does not follow that appliances necessary and furnished for the safe use of the car, although not standardized under § 3, are not within the sweep of § 2. Clearly, those who work on train cars may necessarily have to rely on the security of a dome running board, although the purposes of that appliance may not require any unhesitating reliance on its uniform characteristics.

In the *Williams* case, *supra,* this Court held that the Commission's statutory power to postpone the effective date of its standardization regulations under § 3 did not suspend the railroad's duty under § 2 to make appliances secure. There was no question that the appliance in *Williams* was required, but the teaching of the case is that Commission action under § 3 does not exhaust the commands of § 2. See also *Southern Pac. Co.* v. *Carson,* 169 F. 2d 734, holding a railroad liable under § 2 for defects in an independent wooden club used to help turn a brake wheel where the wheel itself complied with the Commission's regulations, which made no mention of the club. We conclude that failure of the Commission to standardize the dome running board need not mean that it was not a required running board under § 2. To hold otherwise would relieve railroads from the absolute duty under § 2 to make safety appliances secure whenever new appliances are adopted which have not yet been standardized by the Commission.

Both the respondent and the manufacturer of the tank car considered that the dome running board was required for the proper use of the car. The railroad industry

itself has recognized that tank cars require secure dome running boards. The Association of American Railroads safety appliance standards, largely identical to the Interstate Commerce Commission regulations, contain detailed uniform specifications for dome running boards,[6] and compliance with those safety standards is required for interchange of cars between lines.[7] Petitioner used the dome running board, not simply because it happened to be there, but also because it had to be there for him to perform his duties· safely, and performance of his duties was essential to the operation of the tank car. At best, appliances standardized in Commission regulations represent the minimum of safety equipment, and there is no prohibition of additional safety appliances. If a dome running board is provided by the railroad or the makers of the car and ·used by the railroad as an appliance necessary for the use of the car, it must be a safe board as required by § 2. Cf. *Texas & Pacific R. Co.* v. *Rigsby,* 241 U. S. 33, 37.

The Commission, in a brief filed here, contends that only appliances designed to insure safety while the train is in movement are within § 2, and, therefore, a dome running board cannot be a statutory running board. No case is cited to support this construction. Nothing in the language of § 2 itself or in its legislative history indicates that it should be read so narrowly. Whether or not an appliance is designed to afford protection while the train is moving may provide the Commission with an appropriate guide for deciding which appliances should be standardized under § 3. But there is no reason to import such a distinction into § 2 in order to deny the

---

[6] A. A. R. Safety Appliances for Tank Cars Built after May 1,· 1917, Car Builders' Cyclopedia (19th ed. 1953), 938, 939–942.

[7] A. A. R. Code of Rules for the Interchange of Traffic (1952 ed.), Rules 3 (s) (1), 3 (r) (7).

humane benefits of the Act to those who perform dangerous work on train cars that are not moving. Section 2 is not limited to such running boards as are required only in the movement of the train. The dome running board here was required for the use of the car. Section 2 required it to be safe, although regulations pursuant to § 3 had not standardized it.

There is no merit in respondent's contention that, since petitioner is not one of its employees, no duty is owed him under § 2 of the Act. Having been upon the dome running board for the purpose of unloading the car, he was a member of one class for whose benefit that device is a safety appliance under the statute. As to him, the violation of the statute must therefore result in absolute liability. *Coray* v. *Southern Pacific Co.,* 335 U. S. 520; *Brady* v. *Terminal Railroad Assn.,* 303 U. S. 10; *Fairport, P. & E. R. Co.* v. *Meredith,* 292 U. S. 589; *Louisville & N. R. Co.* v. *Layton,* 243 U. S. 617. The judgment below must be reversed and the judgment of the District Court reinstated.

*Reversed.*

MR. JUSTICE HARLAN took no part in the consideration or decision of this case.

MR. JUSTICE REED, with whom MR. JUSTICE FRANKFURTER and MR. JUSTICE BURTON join, dissenting.

The ultimate question presented by this case is whether the defective dome platform [1] which caused petitioner's injury is a safety appliance within the meaning of § 2 of the Act of April 14, 1910, c. 160, 36 Stat. 298, 45 U. S. C. § 11. The Court holds that the dome platform is a

---

[1] The device involved in this case is denominated a dome platform in the Car Builders' Cyclopedia (18th ed. 1949–1951) 253.

"running board" within the meaning of § 2, and that the tank car involved here was a car "requiring" the platform.

First, it can hardly be said that the dome platform is a running board as that term is used in § 2 of the Act. It appears that every device regulated by the Safety Appliance Act is principally designed for use by, and for the protection of, trainmen while railroad cars are in motion. Certainly there is no indication that this legislation was meant to regulate all devices and appliances employed on railroad cars; and there is nothing in the legislative history upon which to base a belief that equipment designed principally for loading and unloading cars, such as a dome platform, was to be covered by the statute. Moreover, while a dome platform might be loosely spoken of as a running board, it does not appear that it falls within the technical definition of that term as used in the trade. A running board is a "plane surface, made of boards or special metal structure, for trainmen to walk or run on." [2] The platform involved here is used principally to stand on to give convenient access to the top of the dome.

However, the principal ground upon which I dissent is aside from the question whether a dome platform is a "running board" under § 2. Assuming that it is, it does not follow that the respondent violated the Act. Pursuant to such an assumption, I will read § 2 of the statute as though the words "dome platforms" appear in the place of "running boards." But even then not every

---

[2] Car Builders' Cyclopedia (19th ed. 1953) 51. Substantially the same definition of the term appears in each of the other eighteen editions of this volume, the first of which was published in 1879 as "The Car-Builder's Dictionary." That edition was published so as to alleviate the "inconvenience, confusion, and delay . . . caused . . . by want of common names for the different parts of [railroad] cars." Preface, The Car-Builders' Dictionary (1879). See also note 1, *supra*.

defective dome platform is prohibited by the statute. So far as pertinent here, § 2 provides that "all cars requiring . . . secure running boards [*viz.*, dome platforms] shall be equipped with such . . . ." The congressional mandate then is merely that railroad carriers shall provide secure dome platforms on cars "requiring" them. No other dome platforms would be safety appliances under this Act. Therefore, the inquiry here narrows to whether this tank car "required" a dome platform.

Section 2 does not itself indicate any means for determining which cars require running boards (dome platforms), and thus does not specify which dome platforms, if any, are safety appliances.[3] However, § 3 of the Act provides that within six months "the Interstate Commerce Commission, after hearing, shall designate the number, dimensions, location, and manner of application of the appliances provided for by section two of this Act . . ."[4] and that those designations are to remain as railroad equipment standards unless changed by the Commission.[5] It seems inescapable, just as a matter of

---

[3] Section 2 does, however, specify which cars require sill steps and handbrakes. "*All* cars must be equipped with secure sill steps and efficient hand brakes . . . ." (Italics supplied.) Assuming that "sill steps" and "hand brakes" include all devices falling within those terms when used generically, it would seem that all such devices are safety appliances and must meet the statutory standard of "secure" or "efficient." Cf. *Southern Pac. Co.* v. *Carson*, 169 F. 2d 734.

[4] The quoted phrase does not appear in 45 U. S. C. § 12, the Code section corresponding to § 3 of the Act. The phrase evidently was omitted from the Code as being fully executed at the time the Code was compiled.

[5] The Act became law on April 14, 1910. Thus, the Commission had until October 13, 1910, within which to adopt its standardizing regulations. Such regulations were adopted on October 13, 1910, by Commission order. Subsequently, on March 13, 1911, the Commission adopted another order superseding the order of October 13, 1910. 49 CFR § 131.1 *et seq.* However, the effective date of the mandate

logic, that since § 3 gave to the Commission the duty to determine, among other things, how many of the "required" § 2 appliances shall be used and where they shall be placed, the Commission was thereby meant to determine which are cars "requiring" running boards (dome platforms), and therefore which dome platforms, if any, are safety appliances. Moreover, if it be assumed that the statute is ambiguous in this matter, the other alternative is to leave to the courts the determination of which types of cars require dome platforms, or any other § 2 equipment except sill steps and handbrakes, to be revealed *ad hoc*. The creation of such uncertainties is not to be favored. But in view of the existence of the Interstate Commerce Commission, an administrative expert in the safety requirements of the railroad industry, coupled with the explicit delegation to the Commission by § 3 of the authority to designate the number and location of the appliances required by § 2, it would seem difficult to conclude anything but that Congress made railroads responsible as insurers only for such running boards as the Commission, not the courts, might determine are required. This purpose of Congress is even more clear from the words of the Act itself than it is from the Code sections, codified long after the regulations were issued.

This leads me to examine the regulations promulgated by the Interstate Commerce Commission pursuant to § 3 of the Act. As previously noted, that section required the Commission to prescribe the uniform standards applicable to the safety appliances set forth in § 2. Nowhere in the regulations (49 CFR § 131.1 *et seq.*) does the Commission prescribe dome platform equipment for tank

of § 2 was, by its terms, not until July 1, 1911, over three months after the final promulgation of the Commission regulations. There was thus no time lag, either actual or contemplated, between the effective date of § 2 and the I. C. C. determinations.

cars.[6]   It follows that tank cars are not cars "requiring"
dome platforms.   Therefore, the absence of such equip-
ment on tank cars, or the presence of such equipment in
a defective condition, should not constitute a violation of
the Act.   Of course, this would not mean that railroads
could with impunity employ insecure dome platforms on
their tank cars, or for that matter, any defective equip-
ment not covered by the Safety Appliance Act.   That
Act does not supplant the basic law of negligence, and
this petitioner has preserved his right of recovery for any
negligence.

The fact that the Association of American Railroads
prescribes dome platforms for tank cars in its safety appli-
ance standards [7] does not suggest a different result.   The
Association is not entrusted with the enforcement of this
statute or with its reach; and while it is commendable
that it has adopted standards in this instance which re-
quire equipment beyond that which may be covered by
the Safety Appliance Act, if I am correct as to the duties
of the Commission, the action of the Association cannot
supplant the determinations of the Commission.

This Court has never before held that railroad car
equipment not specifically required by statute or regu-
lation can be treated as governed by the Safety Appliance
Act.   That issue has been ruled upon in accordance with
this dissent in *Central Vermont R. Co.* v. *Perry*, 10 F. 2d
132.   There the trial court had instructed the jury
affirmatively  on the application of the Safety Appliance

---

[6] 49 CFR §§ 131.8 (b) and 131.9 (c) are the only regulations re-
lating to running boards on tank cars, and it is clear, as well as
conceded, that those subsections do not require a running board of
any sort at or near the dome of these cars.

[7] A. A. R. Safety Appliances for Tank Cars Built after May 1,
1917, Car Builders' Cyclopedia (19th ed. 1953) 939–942; A. A. R.
Code of Rules for the Interchange of Traffic (1952 ed.), Rules 3
(s)(1), 3 (r)(7).

Act with respect to the absence of a footboard across the rear of a tender. Without deciding whether the footboard was a running board within the meaning of § 2 of the 1910 Act, and evidently upon the assumption that it was, the court said:

"As the Safety Appliance Act and its supplements do not require a footboard at the rear end of the tender of a shifting engine and the regulations of the Interstate Commerce Commission do not require one, . . . we are of the opinion that the court erred in its instruction to the jury." *Id.*, at 137.

The position herein expressed is not contrary to *Illinois Central R. Co.* v. *Williams,* 242 U. S. 462. That case involved a defective handhold at the top of a ladder on a boxcar. Section 2 of the Act provides for secure ladders on all cars "requiring" them, and, on "all cars having ladders," it provides for secure handholds at the top of the ladders. The Court commented that "A box car could not properly be used without a secure ladder and . . . all cars having ladders must be equipped with secure hand holds . . . ." *Id.*, at 464. But I do not understand this to have been a holding by the Court that, apart from any Interstate Commerce Commission determination, boxcars require secure ladders. At most the comment was a dictum, since it was clearly not necessary to decide whether the car involved required a secure ladder. The car had a ladder, and all cars "having ladders shall also be equipped with secure hand holds or grab irons on their roofs . . . ." Moreover, as later appears in that case, the Commission had previously issued an order designating the number, dimensions, location, and manner of application of ladders on boxcars. While that order granted an extension of time of five years within which to comply with the standards therein prescribed, it nonetheless constituted a Commission determination that box-

cars require secure ladders within the meaning of § 2. For similar reasons *Texas & Pacific R. Co.* v. *Rigsby,* 241 U. S. 33, is not contrary to this dissent. See *Atchison, T. & S. F. R. Co.* v. *Scarlett,* 300 U. S. 471.

Finally, continuing to assume that a dome platform is a running board under § 2, and now upon the further assumption that the courts were meant to decide which cars require them, a dissent is still indicated. In these circumstances, consistent with the normal rule, great respect should be given to the interpretation of an act by the administrative agency designated to administer it.[8] As has been observed, the regulations of the Interstate Commerce Commission prescribing the uniform standards applicable to § 2 safety appliances omit to mention dome platform equipment for tank cars. Thus the Commission does not understand dome platforms to be "required" for tank cars under § 2. If it had so understood, it is reasonable to believe it would have provided standards for such equipment in its regulations. Moreover, at the request of the Court, the Commission advised by brief in this case that the dome platform was not even a running board, much less a required running board. Following this Court's ruling in *Davis* v. *Manry,* 266 U. S. 401, this "construction by the Commission—the tribunal to which the application of § 2 is entrusted and which would be solicitous to enforce it—" should be followed. *Id.,* at 404–405.

For these reasons the judgment should be affirmed.

---

[8] *United States* v. *American Trucking Assns.,* 310 U. S. 534, 549.