**HERCULES, INC., et al., Appellants,**

v.

**Earl EILERS and Peggy Patrick, et al., Appellees.**

**No. 7108.**

Court of Civil Appeals of Texas, Beaumont.

Sept. 10, 1970.

Rehearing Denied Sept. 28, 1970.

George A. Weller, Chilton O'Brien, Beaumont, Richard B. Miller, Houston, for appellants.

Joe H. Tonahill, March H. Coffield, Jasper, Gilbert I. Low, Beaumont, for appellees.

KEITH, Justice.

Glenn Patrick was killed and Earl Eilers seriously injured when a dome lid on a railroad tank car blew of, knocking them to the ground. They were employees of Eas-Tex, Inc. (hereinafter "EasTex"), owner of a papermill at Evadale, Texas. Union Tank Car Company (hereinafter "Union Tank") leased a tank car to Hercules, Inc. (hereinafter "Hercules") for the purpose of transporting crude turpentine to the plant of Hercules in Hattiesburg, Mississippi. The Atchison, Topeka and Santa Fe Railway Company (hereinafter "Santa Fe") was the delivering carrier of the empty car to EasTex.

In this action, Eilers and Mrs. Patrick and her children (hereinafter referred to collectively as "plaintiffs") were joined by the subrogated Workmen's Compensation Insurance carrier, but we need take no further notice of the latter's presence. Plaintiffs named Hercules, Union Tank and Santa Fe as defendants. Upon certain findings of the jury which we will discuss later, judgment was rendered for plaintiffs and against the defendants, jointly and severally.

The tank car in question, empty except for 140 pounds of liquid ammonia to inhibit corrosion, was shipped by Hercules from Hattiesburg, Mississippi, on September 1, 1967, to EasTex in Evadale, Texas, where it was delivered by Santa Fe as the final carrier. The record is silent as to what, if anything, was done with the car until October 4, when Santa Fe placed it on the turpentine track in the plant of EasTex. The car was equipped with valves which permitted the car to be "bottom-loaded" with raw turpentine by EasTex. Ordinarily, in order to do so, it was necessary for the dome lid to be raised and a wheel located therein turned so as to open the valve on the bottom of the car. The dome cover or lid was kept in place while the car was in transit by a number of large hinged bolts, which laid down on the top of the car itself after the retaining wing nuts were removed from the bolts.

Hercules offered as its witness a former employee of EasTex, Wells, who testified that in the course of preparing to pump turpentine into the car, he opened the valves thereon after lifting the lid from the dome. Plaintiffs, on the other hand, offered testimony that the bolts holding the lid in place were laying upon the top of the car when it was spotted by Santa Fe and that it was unnecessary to open the valves before pumping started.[1] In any

1. The jury was unable to answer Special Issue No. 62, inquiring if EasTex personnel opened the dome cover after delivery of the car to EasTex by Santa Fe; and,

event, EasTex began loading the car on October 4, and continued pumping from time to time as turpentine was produced until the morning of October 17, when the accident occurred. However, EasTex had discovered on October 15 that the lid was stuck so tightly to the dome that an Eas-Tex workman was unable to dislodge it although he struck it with a large pipe wrench and used a heavy piece of pipe in an effort to prize the lid loose from the dome. The pipefitter, Rush, failing in his efforts to remove the cover, reported to Leroy Mitchell, the tour foreman for Eas-Tex on duty at the time, that it was stuck. Rush and Mitchell had a discussion concerning the methods to be used in removing the cover, including the use of a hydraulic jack. However, it was Sunday, and Rush was on a special call-out, as distinguished from his regular tour of duty, and they never came to any agreement as to what means would be used to dislocate the stuck lid.

During the time the car was on the turpentine track, between October 4 and October 17, EasTex pumped turpentine into the car upon each day for a total of fifteen hours and fifty minutes. Turpentine was pumped into the car for an hour upon October 16 and for an hour again on October 17, *after* it had been learned that the lid was stuck tightly to the dome. The pumping was stopped at 7:50 a. m., October 17, and the accident occurred ten minutes later.

The car was equipped with standard safety valves approved by the regulatory authorities, designed to relieve internal pressure when it exceeded 25 pounds per square inch (hereinafter "psi"). With bottom loading under pressure, there was no way for the air in the tank to escape except through the dome; and, with the lid stuck tightly, pressure in the car increased as pumping into the car continued. Eas-Tex, without notifying either Eilers or

Patrick that the dome lid had been stuck for two days while the pumping continued, sent them to the top of the car to close the bottom valve so that the car could be shipped. Eilers, the only person in position to testify, stated that just as they got upon the top of the car, the dome lid blew off, killing Patrick and injuring him.

The court submitted more than a hundred special issues in which the jury was subjected to cross-examination upon every theory of law and fact which came to the minds of the inventive and resourceful counsel for the several parties. In essence, the jury failed to find any common-law negligence on the part of any defendant, acquitted Eilers and Patrick of contributory negligence, failed to find that any act or omission of EasTex was the sole cause of the accident, and found that the car was reasonably suited for the purpose for which it was intended, both at the time it was delivered to EasTex and at the time of the accident.

The jury found that the safety valves upon the car were "safety appliances" under the court's definition, but nullified the effect, if any of the finding by failing to find that the valves did not "perform properly." The jury also found that the dome lid "which was to release the car's internal pressure around its edges when not bolted tight" was a safety appliance under the court's definition; that the dome lid "failed to operate properly to release the car's internal pressure"; and that this was a proximate cause of the occurrence. We will have occasion to comment more in detail upon these and the remaining issues in connection with our discussion of the questions presented.

The motions of the several defendants for judgment non obstante veredicto, to disregard certain findings, and to enter judgment for the defendants were each overruled. Judgment was rendered in

the succeeding issue as to closure, being conditionally submitted, was likewise unanswered. Our disposition of the case

does not require further exploration of this facet of the matter.

favor of the several plaintiffs against the defendants jointly and severally, from which this appeal is prosecuted.[2] The record is lengthy, the briefs are prolix, and many questions are presented for our consideration. Since the liability is based upon the asserted applicability of the Safety Appliance Act, we first consider the Act itself.

The Safety Appliance Acts (45 U.S.C.A. § 1 et seq.) [hereinafter "Act"] does not mention every component making up a car used upon railroad lines. Instead, it is very limited in its scope, although liberally construed by the courts.[3] The Act makes it unlawful for any carrier to use on its lines a locomotive engine not equipped with a power-driving wheel brake, or to run a train that has not a sufficient number of cars in it so equipped with power or train brakes that the engineer on the locomotive drawing such train can control its speed without requiring brakemen to use the common hand brake for that purpose (45 U.S.C.A. § 1); or to use on its line a car "not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars" (*Id.* § 2); or, until otherwise ordered by the Interstate Commerce Commission (hereinafter "ICC") to use a car "that is not provided with secure grab irons or handholds in the ends and sides of each car for greater security to men in coupling and uncoupling cars," (*Id.* § 4); or to use freight cars, either loaded or unloaded which do not comply with the prescribed standards as to height of drawbars (*Id.* § 5).

*Section 11* of the Act reads:

"It shall be unlawful for any common carrier subject to the provisions of sections 11–16 of this title to haul, or permit to be hauled or used on its line, any car subject to the provisions of said sections not equipped with appliances provided for in said sections, to wit: All cars must be equipped with secure sill steps and efficient hand brakes; all cars requiring secure ladders and secure running boards shall be equipped with such ladders and running boards, and all cars having ladders shall also be equipped with secure handholds or grab irons on their roofs at the tops of such ladders: *Provided,* That "in the loading and hauling of long commodities, requiring more than one car, the hand brakes may be omitted on all save one of the cars while they are thus combined for such purpose. (Emphasis in Act.)

Other provisions of the Act (specifically §§ 12 and 15) grant to the ICC authority to adopt regulations interpreting and standardizing the requirements of the Act as to require safety appliances, and these regulations prescribe detail standards of construction and inspection.[4]

As to the appliances mentioned in the Act itself, the criterion by which the sufficiency of such appliances is to be judged is the essence of simplicity. Thus, sill steps must be *secure;* hand brakes must be *efficient;* cars requiring secure ladders and secure running boards shall be equipped with *"such* ladders and running boards"; and, cars having ladders shall be equipped with *secure* handholds or grab irons on their roofs at the top of such

---

2. Eilers was awarded $42,000.00 for his injuries; Mrs. Patrick, the widow *and* each of the two minor children recovered $80,000.00 and Mrs. Patrick recovered, on behalf of the community estate, $1,500.00 funeral expenses.

3. For a discussion of a few of the cases on liberality of construction of the Act, see

Missouri-Kansas-Texas R. Co. v. Evans, 151 Tex. 340, 250 S.W.2d 385, 398 (1952).

4. In 1969 this administrative duty was transferred from the Interstate Commerce Commission to the Department of Transportation. 49 U.S.C.A. § 1655(e) (1).

ladders.[5] There is no permissible deviation from the standard so set by the Act itself as to the appliances mentioned therein. But, it is equally clear that the Act does not require a perfect car in its entirety. There is no mention, for instance, of wheels which will not break or of doors which are securely attached so as not to fall, or for that matter, dome lids which will not blow off when too much internal pressure is applied in loading a car. These latter instances of the wheels, the doors, and the dome lids find no specific mention in the Act itself.

This court, in Kansas City Southern Railroad Company v. Guillory, 376 S.W.2d 72, 74 (Tex.Civ.App.—Beaumont, 1964, error ref. n. r. e.), spoke of the general rule governing the obligation and duty of a carrier in furnishing cars to consignors and consignees, saying:

> " * * * there seems to be a general unanimity of authority that a railway company is required to exercise ordinary care in order that a reasonably safe car may be furnished for those using it, 75 C.J.S. Railroads § 924, pp. 333–336, * * *"

■ In addition to the authorities considered in *Guillory,* attention is called to the exhaustive annotation to be found in 99 A.L.R.2d 176, et seq., "Railroad—Loading or Unloading—Injury," where cases from many jurisdictions are collated. As to non-employees, the rule is, except in the so-called "penalty violations" arising from a breach of the duty imposed by the Safety Appliance Act or the Boiler Inspection Act (45 U.S.C.A. § 22 et seq.), that there must be a finding of a breach of the duty of exercising ordinary care, i. e., negligence, proximately causing injury before liability can be imposed. Defendants pro-

cured a finding that the car furnished to EasTex was reasonably suited for the purposes for which it was intended, Special Issue No. 88–A, discussed hereinafter. In this case, plaintiffs make no effort to support the judgment upon the rule of law enunciated in this paragraph.

Instead, in a "Summary of the Propositions Presented", plaintiffs say:

> "I. This is a case governed by the Safety Appliance Acts, 45 USC, Section 1, et seq., and the cases interpreting and liberalizing the Acts' coverage and effects.
>
> *   *   *   *   *   *
>
> "C. The dome lid on tank car No. UTLX 48028 was a safety appliance within the meaning and spirit of the Safety Appliance Acts as applied."

For the reasons set out hereinafter, we disagree.

Plaintiffs' first series of counter-points (Nos. 1–4), brings into focus their contention announced above: that the dome lid was a safety appliance under the Act; and it is said, since it failed to vent the internal pressure created by the bottom-loading of the car, absolute liability followed as a matter of law. The major premise—that the dome lid was a safety appliance under the Act—is said to find support in the jury verdict, but no statutory or case law is submitted to establish such assertion. The series of issues (all answered affirmatively) brought forward for consideration are these:

*Special Issue No. 7:* "Do you find from a preponderance of the evidence that the dome lid on tank car No. 48028 which was to release the car's internal pressure around its edges when down but not

---

5. Counsel for Hercules, commenting upon the finding of the jury that the dome lid in question "failed to operate properly" (Special Issue No. 8 mentioned hereinafter), aptly remarks:
"But an engrafted requirement that some appliance 'operate properly' is about as vague as the Boy Scott motto, 'Be Prepared.' Must a dome cover be 'secure' or 'efficient' or 'tight' or 'loose?' There is simply no statutory standard a dome cover must meet."

bolted tight [sic] was a safety appliance?[6]

"By the term 'safety appliance' is meant an appliance necessary and furnished for the safe use of a railroad tank car and the proper and efficient operation of which is required for the absolute safety of those whose work takes them on or near a railroad tank car."

*Special Issue No. 8:* "* * * the dome lid on tank car No. 48028 failed to operate properly to release the car's internal pressure?"[7]

*Special Issue No. 9:* "* * * [which] was a proximate cause of the occurrence in question?"

At the outset, we remove from the area of contention certain well-recognized principles of law applicable in cases involving the Act. For the purpose of this immediate discussion, *we assume in cases involving appliances mentioned in the Act,* that these rules apply:

(a) Eilers and Patrick were members of a "class for whose benefit that device is a safety appliance under the statute. As to him [them], the violation of the statute must therefore result in absolute liability." Shields v. Atlantic Coast Line Railroad Co., 350 U.S. 318, 325, 76 S.Ct. 386, 391, 100 L.Ed. 364 (1955) and cases therein cited.

(b) The violation of the statute results in absolute liability since the duty imposed is an absolute one. *Shields,* supra; Brady v. Terminal Railroad Association, 303 U.S. 10, 15, 58 S.Ct. 426, 82 L.Ed. 614 (1937); Thomas v. Kansas City Southern Railway Co., 305 S.W.2d 642, 646 (Tex.Civ.App.—Beaumont, 1957, error ref., n. r. e.), cert. den., 356 U.S. 959, 78 S.Ct. 995, 2 L.Ed.2d 1066.

(c) The Act did not create a cause of action and the non-employee, such as Eilers and Patrick, "must look for his remedy to the common-law action in tort, * * * [and] * * * the definition of causation and the availability of the defenses of assumption of the risk and contributory negligence are left to state law." Crane v. Cedar Rapids & Iowa City Railway Co., 395 U.S. 164, 89 S.Ct. 1706, 23 L.Ed.2d 176 (1969).

■ Santa Fe, in its original brief filed herein as an appellant, makes this dogmatic statement with reference to ICC regulations existing at the time of the accident, saying that such

"* * * are found in the Code of Federal Regulations, Title 49, Transportation, Part 231, Railroad Safety Appliance Standards. Sections 231.7 to 231.9 and 231.21 of these Regulations deal specifically with tank cars of various types. These sections make specific provision for the number of hand brakes, the dimensions, locations and the manner of application of sill steps, side handholds, end handholds, tank head handholds, safety railings, operating platform ladder and safety railings, the specifications for uncoupling levers and end ladder clearances.

*"The Interstate Commerce Commission and Transportation Department Regulations have never mentioned or referred to the dome lid cover of tank cars.*

"During the course of trial, the Plaintiffs did not offer any evidence of or make any suggestion that there was in existence approved or required specifications for tank car dome lid covers promulgated by governmental authority, trade association, or any other body the

---

6. We do not reach defendants' complaints addressed to the form and content of the issue and its accompanying definition.

7. The jury had already found that the safety valves on the car were "safety ap-

pliances" under the definition used in No. 7, but did not find that the safety valves "failed to perform properly." (Special Issues Nos. 4 and 5)

standards of which had been violated by the tank dome lid or cover on car UTLX 48028." (Emphasis supplied) [8]

Plaintiffs have not challenged the statement contained in Santa Fe's brief and we accept the same as true (see fn. 8, supra). Rule 419, Texas Rules of Civil Procedure. The fact that ICC has not mentioned dome lid covers in its regulations does not, however, conclusively establish as a matter of law that such instrumentalities are not safety appliances within the reach of the Act. *Shields, supra* (350 U.S. at p. 321, 76 S.Ct. 386).

We have mentioned that plaintiffs rely upon the jury finding, as a fact, that the dome lid was a safety appliance. Each of the defendants contend that whether or not the dome lid is an appliance within the meaning of the Act is a question of law for determination by the court, not the jury. Thus, in our consideration of this question, we reach the heart of the problem presented by this case.

While the Supreme Court of the United States reversed the lower court in *Shields, supra,* it did so because it considered that the dome running board involved therein was a safety appliance within the meaning of the Act. It did not repudiate or overrule the lower court's holding that such determination was one of law, not of fact. In words pregnant with good judgment and sound law and particularly apropos to the contentions of the plaintiffs, Judge Hutcheson in Atlantic Coast Line Railroad Co. v. Shields, 220 F.2d 242, 245 (5th Cir., 1955), reversed on other grounds, 350 U.S.

318, 76 S.Ct. 386, 100 L.Ed. 364 (1955) said:

"He [the trial court] did correctly declare in his charge: that whether it was or was not a safety appliance was to be determined as matter of law; and that he did not and would not consider the testimony of any of the witnesses as to whether it was or was not.

\* \* \* \* \* \*

"As appellant correctly points out in the discussion in its brief, a chaotic condition would be produced if the question of compliance with the Safety Appliance Act and the specifications governing the number, location, dimension and manner of appliances should be left to the varying notions of judges or the inexperienced laymen who comprise petit juries. For it is not every device with which a car might be equipped which comes under, and is governed by, the Safety Appliance Act or the regulations adopted by the Interstate Commerce Commission pursuant thereto. Only those are safety appliances which are officially determined by law or regulation to be such. [citations omitted]"

Justice Anderson, although not citing Judge Hutcheson's remarks, came to the same conclusion in *Thomas, supra* (305 S.W.2d at p. 645):

"\* \* \* as we understand the record, the trial judge concluded that, *as a matter of law,* the board that gave way with appellant was not a grab iron or handhold within the scope of the above-quoted provision of the Safety Appliance Acts.

"\* \* \* we have concluded that within contemplation of the Safety Appliance

---

8. Similar statements found in the briefs of Union Tank (at p. 61) and Hercules (at p. 30) are not challenged by plaintiffs. The first line of the "statement of facts" found in plaintiffs' brief reads: "Any statement of the facts of this case by any defendant which is inconsistent with the following is not admitted, agreed to, or accepted by plaintiffs." With four sets of briefs to be considered, some containing hundreds of pages, we do not consider this caveat of plaintiffs to be acceptable within the spirit and meaning of Rule 419. Such a construction would render meaningless Rule 419 and thrust a burden upon the court which properly should be assumed by the appellees, plaintiffs below. Nevertheless, we have carefully considered the voluminous record and find that the statements of the defendants so noted are true to the record.

---

Acts the board that gave way with appellant was, *as a matter of law,* a handhold which appellee was required to have secure." (Emphasis supplied)

Other than for general language from a host of cases speaking of the liberality of construction of the Act, plaintiffs rely upon *Shields* and *Thomas* to support their recovery. We say, as was said in Mazzucola v. Pennsylania Railroad Co., 281 F.2d 267, 268 (3rd Cir., 1960): "Plaintiff's claim for protection under the Federal Safety Appliance Act is as ingenious as it is unsound." [9]

In *Shields,* Justice Minton noted that § 2 of the Act required that " '* * * all cars required secure ladders and secure running boards shall be equipped with such ladders and running boards * * *' " He then noted that ICC had promulgated regulations pertaining to "running boards" on tank cars (350 U.S. at p. 320, 76 S.Ct. at p. 389). He then commented upon the fact that "the dome running board has major importance in loading and unloading operations" (p. 321, 76 S.Ct. p. 389), was also used by railroad men in passing signals, etc., and that the railroad men using such cars often "refer to the dome running board as a running board." (Id.) So finding support in the Act, in ICC regulations, and *use* of the device as a "running board", he came to the crux of the decision saying: "We hold that it [the dome running board] comes within the meaning of the term 'running boards' as used in § 2." (Id.) No one can or does fault that determination. Mr. Justice Minton found simply that his particular type of board was a "running board" as defined in the Act.

Plaintiffs here lack any supporting language in the Act, ICC regulations or use. The hard and stubborn fact remains—dome lid covers are not mentioned in the Act, regulations, or otherwise. Congress has not spoken, ICC has taken no action, and no court has ever attempted to classify dome lid covers as safety appliances under the Act. We are of the opinion that the question of whether an instrumentality is an "appliance" within the meaning of the Act is a question of law for determination by the court, not a question of fact for a jury. Further, our review of the authorities leads us to the conclusion that no instrumentality is a "safety appliance" within the meaning of the Act unless it is specifically mentioned in the Act or the regulations of ICC, or is used as a substitute for something which is so mentioned or used. Neither *Shields* nor the Act authorized a jury of laymen to determine that the dome lid was a safety appliance under the Act.

Nor do plaintiffs fare any better when we come to consider this court's decision in *Thomas,* supra. The defective board which split and partially gave way was actually being used by Thomas as a handhold. Rather than being "secure", it broke, casting him to the ground causing his injuries. Justice Anderson, speaking for this court, held that the defective board was, in law and in fact, a handhold, saying:

"The board's position rendered it inevitable that frequently, if not invariably, it would be grasped by any one entering or leaving the car by way of the ladder or seeking or departing a position atop the wall of the car or standing high on the ladder or passing from the ladder to its counterpart on the end of the car. * * * The conclusion is inescapable, therefore, *that the board that gave way with appellant was both designed and intended as a handhold, and as a practical*

9. The caterpillar tractor Mazzucola was using to move cars was not equipped with an automatic coupling device, although such devices were on the cars being moved. His argument was that the tractor was a "locomotive" because of the use to which it was then being put. Judge Goodrich says: "According to this line of argument, a team of mules hitched to a car to move it would be a 'locomotive' and so would a block and tackle device operated by human power exerted for the same purpose."

*matter was a handhold,* even though considerations other than the installation of a handhold accounted for its being on the car in the first instance." (305 S.W. 2d at p. 645, emphasis supplied)

As he had pointed out on the previous page, "grab irons and handholds" were specifically mentioned in § 4 of the Act and were required to be secure. Plaintiffs can point to no such statutory basis when they speak of the dome lid as a pressure venting device.

Plaintiffs also cite Southland Paper Mills, Inc. v. Rhoads, 434 S.W.2d 730 (Tex. Civ.App.—Beaumont, 1968, no writ), as supporting their position. This was an interlocutory appeal involving venue and the judgment of the trial court found support in the record upon grounds other than the applicability of the Act. Nevertheless, we have reviewed the opinion in *Rhoads* but find no basis for its use in this case.

Calling attention to the fact that the regulations of ICC required that the dome be "surrounded by a safety rail and a platform"; and it being admitted that the car in question had no such railing, the court in *Rhoads* simply held that the Act was applicable. (434 S.W.2d at p. 732) We have no parallel situation present in this case. Particularly, we have no ICC regulation touching in any manner the use of a dome lid as a venting mechanism. *Rhoads* fails to support plaintiffs' position

because of this distinction, one going to the heart of the controversy.

■ We have carefully considered all of the authorities cited by the plaintiffs [10] in support of their contention that the dome lid was a safety appliance within the meaning of the Act and find no support for such position. It follows, therefore, that we are of the opinion that the trial court erred in overruling the several appropriate motions of the several defendants challenging such holding. Consequently, we sustain the following points in the respective briefs of the appellants: Hercules' points 1, 2, 3, 4, 7, 8 and 10; Santa Fe's points 1, 2 and 4; Union Tanks' points 3, 4, 8, 9 and 23. Conversely, after considering plaintiffs' counter-points one through four, we find no merit therein.

■ The judgment of the trial court can find support only in the findings that the dome lid was a safety appliance within the Act since no issue of negligence was submitted in connection with the issues submitting such question. Each of the several defendants objected to the submission of Special Issue No. 8, and to the series as a whole, for the reason that no issue on negligence was submitted. On the other hand, plaintiffs have consistently taken the position that the series was one under the Act and that liability was absolute without the necessity of a finding of negligence. We recognize the rule that in a proper case in-

10. In addition to the cases discussed previously, plaintiffs cite and rely upon the following cases, all of which have been examined and studied carefully: Coray v. Southern Pacific Co., 335 U.S. 520, 69 S.Ct. 275, 93 L.Ed. 208 (1948) [defective air brakes on train]; O'Donnell v. Elgin, Joliet & Eastern Railway Company, 338 U.S. 384, 70 S.Ct. 200, 94 L.Ed. 187 (1949) [defective coupler]; Affolder v. New York, Chicago & St. Louis Railroad Company, 339 U.S. 96, 70 S.Ct. 509, 94 L.Ed. 683 (1949) [defective coupler]; Fairport, Painesville & Eastern Railroad Co. v. Meredith, 292 U.S. 589, 54 S.Ct. 826, 78 L.Ed. 1446 (1933) [no air brake connection between locomotive and cars—non-employee injured in grade

crossing accident]; Brady v. Terminal Railroad Association of St. Louis, supra, [insecure grab iron caused injury to employee of another railroad]; Colorado Milling & Elevator Company v. Terminal Railroad Ass'n, 350 F.2d 273 (8th Cir., 1965) [defective brake]; Rodgers v. Conemaugh & Black Lick Railroad Company, 137 F.Supp. 467 (D.C., W.D., Pa., 1956) ["loose and flapping" sill step and grab iron]; Monongahela Railway Company v. Black, 235 F.2d 406 (4th Cir., 1956) [defective brakes]; Barney v. Staten Island Rapid Transit Railway Company, 316 F.2d 38 (3rd Cir., 1962) [consignee's employee injured on insecure ladder on car].

volving a safety appliance, liability is absolute and plaintiff need not procure a finding of negligence. *Shields*, supra.

But, we have held the series of issues does not establish liability under the Act; consequently, if plaintiffs were to obtain any benefit from such series, they should have included a finding of negligence. Petroleum Anchor Equipment, Inc., v. Tyra, 419 S.W.2d 829, 834 (Tex.Sup., 1967); Luther Transfer & Storage, Inc. v. Walton, 156 Tex. 492, 296 S.W.2d 750, 755 (1956). No such issue was included and no finding of negligence can now be presumed. Thus, plaintiffs gain nothing by this series of issues, either under the Act or under the common law.

Our review has disposed of every issue of liability as against Santa Fe; but, as to Hercules and Union Tank, there remains for consideration the legal effect, if any, of the answers to Special Issues Nos. 10, 11, and 12 (as to Union Tank) and identical issues Nos. 13, 14, and 15 (as to Hercules), all of which were answered affirmatively. Similar issues submitted as to Santa Fe were answered favorably to Santa Fe and adversely to plaintiffs. We now quote the series applicable to Union Tank:

*No. 10*: "* * * Union Tank Car Company supplied tank car No. UTLX 48028 with a dome lid which said defendant expected to serve and be used as an appliance necessary for the purpose of releasing the internal pressure, if any, of said tank car at the time and on the occasion in question?"

*No. 11*, conditioned upon an affirmative answer to No. 10: "* * * the dome lid failed to release the internal pressure, if any, of tank car No. UTLX 48028 as expected, if it was, by defendant Union Tank Car Company?"

*No. 12*, conditioned upon an affirmative answer to No. 11: "* * * such failure of the dome lid to release the internal pressure, if you have so found, was a proximate cause of the fatal injury to Glenn Patrick and the personal injuries to Earl Eilers?"

Attention is called to the fact that again there is no negligence issue included within this cluster nor is there any amplification of the key words used in No. 10: "* * * which said defendant expected to serve and be used as an appliance * * *"

Before turning to a consideration of the several massive assaults made upon the series of issues just mentioned, we mention some of the other *non-findings* of the jury, so as to bring into proper apposition these particular issues just quoted. *Plaintiffs failed to convince the jury* (i. e., did not procure affirmative answers to every necessary issue in each series) *that any of the following facts existed*:

(a) That the safety valves failed to perform properly [No. 4];

(b) That one of the safety valves was defective [No. 19];

(c) That the corroded condition of the dome on the car rendered it defective for its intended use [No. 22];

(d) That the maintenance of safety valves on the car which allowed internal pressure to build up to 25 psi before activating the valves rendered the car unsafe for its intended use [No. 29];

(e) That when the dome lid did not release the pressure because it was stuck and the safety valves would not release the internal pressure until it reached 25 psi, the tank car was negligently maintained [No. 33];

(f) That the defendants failed to inspect the safety valves on the car as reasonably prudent inspectors would have done [No. 35];

(g) That the defendants failed to inspect the dome lid, as reasonably prudent inspectors would have done,

before moving the car into the premises of EasTex [No. 39];

(h) That Union Tank failed to properly repair the safety valves [No. 43];

(i) That before delivery of the car by Santa Fe, all closures of openings on the tank car were not properly secured in place [No. 46];

(j) That each defendant was negligent failing to warn Eilers and Patrick of the defective tank car [No. 50];

(k) That the safety valves on the car were defective at the time such car was delivered to EasTex [No. 85].

On the other hand, the jury found, *affirmatively,* these defensive issues:

(a) That the *dome cover* on the car was reasonably suited for the purpose for which it was intended at the time of the delivery of the car to EasTex [No. 88];

(b) That the *car* was reasonably suited for the purpose for which it was intended at the time of the delivery to EasTex [No. 88–A];

(c) That the car was inspected by Santa Fe employees at four different times before delivery of the car to EasTex [Nos. 94, 95, 96, and 97];

(d) The inspection was visual and made from the ground [No. 98] and did not reveal the hidden defect which caused the dome lid to be blown off [No. 99].

■ When we return to a consideration of the issues remaining—as to what Union Tank and Hercules might have "expected" of the dome lid as a pressure releasing device—one legal conclusion is inevitable: no issue in either series constitutes a finding of a violation of the Safety Appliance Act. Secondly, there being no finding of common law negligence, liability cannot be predicated upon that doctrine. Finally, the factual basis for the findings are attacked under the appropriate no-evidence points.[11] In our consideration of this point, we do so under the rule announced in Renfro Drug Co. v. Lewis, 149 Tex. 507, 235 S.W.2d 609, 613 (1950), considering only the evidence most favorable to the finding and disregarding that which is opposed to it.

■ Plaintiffs attempt to find support in the evidence for the findings of the jury to the issues under discussion by pointing to the answers to the interrogatories served upon Union Tank and Hercules.[12] The answer to the interrogatory became evidence in the case when offered by the interrogators (plaintiffs) as an admission

11. Additionally, Hercules contends that the issues lack support in the pleadings of the plaintiffs. While the contention appears to have merit, we do not turn the case on this point. Gulf, Colorado & Santa Fe Railway Co. v. Bliss, 368 S.W.2d 594, 599 (Tex.Sup., 1963); Hammer v. Dallas Transit Company, 400 S.W.2d 885, 889 (Tex.Sup., 1966).

12. Interrogatory No. 19, subdivisions (a) and (b), propounded to Union Tank, are quoted:
"*(a)* State in detail the manner in which the dome lid or cover which was installed on tank car no. UTLX 48028 is opened, *(b)* the sequence of steps involved in opening said dome lid or cover." *Answer:* "Manner in which the dome lid or cover is opened and/or the sequence of steps involved in opening said dome lid or cover are: 1. Remove seal from seal bolt. 2. Loosen all nuts a little at a time until all internal pressure (if any) has been relieved. 3. Unscrew all nuts up to retaining nuts and throw back all eye bolts except hinge bolt marked (H) and the seal bolt marked (S) 4. Lift cover on seal bolt side which will allow hinge bolt to be thrown back. Cover can then be removed. [Reference is made to Drawing No. 55357, dated August 16, 1937.]" (The drawing mentioned is likewise in evidence and it contains a "note" giving similar instructions for the opening of the dome, referring to particular sketches on the drawing.)
Hercules, asked the same question, contended itself by answer that the car was equipped with safety valves designed to release at 25 pounds pressure per square inch, and suggested that other information sought in the interrogatory be obtained from Union Tank.

against interest on the part of the party interrogated (Union Tank). Rule 168, T.R.C.P. See also, Heilig v Studebaker Corporation, 347 F.2d 686, 689 (10th Cir., 1965), construing the comparable Federal Rule of Civil Procedure, Rule 33, F.R.C.P. And, we are willing to accept plaintiffs' further argument that Hercules, because of the manner in which it answered the identical interrogatory submitted to it, may have bound itself to the answer given by Union Tank.

So conceding, however, we do not reach the end sought by the plaintiffs, evidentiary support for the answers to special issues under discussion. Obviously, the interrogatory sought information as to the manner of opening the tank car preparatory to commencement of loading or unloading operations. If pressure had built up in the tank car during transit, the procedure outlined in the answer was designed to assure a safe release thereof; but, we decline to attribute to the answer the effect the plaintiffs now urge. Indeed, it would be equally consistent to use the answer as uncontradicted evidence that plaintiffs failed to use reasonable care in releasing the pressure. For, if the lid had been bolted in place, it could not have blown off while the internal pressure in the car was being released.

Thus, our review of the evidence does not disclose *any* support for the finding as to what, if anything, either Union Tank or Hercules "expected" of the dome lid cover as a pressure release mechanism. Neither Hercules nor Union Tank offered any witnesses on the subject nor did plaintiffs offer any evidence as to what either of the two defendants might have "expected" under the circumstances. There is evidence, however, offered by Hercules and Union Tank through cross-examination of plaintiffs' witnesses, that proper procedure in bottom-loading tank cars required the removal of the lid during the operation. But, when we consider the other side of the coin, we find no evidence in the record supporting or tending to support the finding

that either Hercules or Union Tank "expected" the dome lid to be used as an auxiliary safety vent. Plaintiffs have, therefore, failed to bring forward the necessary proof to support the issue. Having carefully studied the more than seven hundred page statement of facts, we are unable to find even a "glimmer of evidence" supporting the issues. Seideneck v. Cal Bayreuther Associates, 451 S.W.2d 752, 755 (Tex.Sup., 1970).

■ More important, however, is the fact that the series of issues did not fix liability under the Safety Appliance Act for the reasons set forth in our prior discussion of the preceding series of issues, Nos. 7, 8, and 9 (supra, pp. 230–232). Absolute liability for the violation of the provisions of the Safety Appliance Act can be imposed only because a carrier has not complied with the provisions of this Act of Congress. Liability may not be imposed because some part of a car, not mentioned in either the Act or the regulations, fails to come up to the undisclosed expectations of the owner, lessee, or the carrier temporarily in possession thereof.

■ Nor can plaintiffs use the series as supporting a common-law finding of liability because there was no negligence issue submitted and the several defendants pointed out such omission in their objections to the charge. Petroleum Anchor Equipment, Inc. v. Tyra, supra (419 S.W.2d at p. 834).

The points of Union Tank and Hercules assailing the respecting issues (Nos. 10, 11, and 12 as to Union Tank and Nos. 13, 14, and 15 as to Hercules) are sustained. It was error for the trial court to enter judgment predicated in any manner upon the findings of the jury in response to these issues.

When we examine the judgment, in the light of the answers of the jury to the remaining questions, we find that there is no other possible basis for liability asserted by the plaintiffs. Each defendant was acquitted of any act of common-law negli-

gence proximately causing the injury to Eilers and the death of Patrick. Thus, the remaining points of the several defendants, and there are many, become immaterial in the disposition of the case. There being no liability as a matter of law upon the part of any of defendants under the Act, and there being no liability under the common law as a matter of fact, the trial court erred in rendering judgment against the defendants, or either of them.

The judgment of the trial court is here and now reversed and judgment rendered for each of the appellants.

All costs in all courts are assessed against plaintiffs and intervenor, jointly and severally.